FILED '07 JUL 17 10:33 USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JANET L. SHANNON,                    )     Civil No. 06-6214-JE
                                     )
                  Plaintiff,         )
                                     )
        v.                           )     FINDINGS AND
                                     )     RECOMMENDATION
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
                  Defendant.         )
_____)

        Kathryn Tassinari
        Drew L. Johnson
        1700 Valley River Drive, First Floor
        Eugene, OR 97401
            Attorneys for Plaintiff

        Karin J. Immergut
        U.S. Attorney
        Neil J. Evans
        Asst. U.S. Attorney
        1000 S.W. 3rd Avenue, Suite 600
        Portland, OR 97204-2902

        Joanne E. Dantonio
        Special Asst. U.S. Attorney
        Social Security Administration
        701 5th Avenue, Suite 2900 M/S 901
        Seattle, WA 98104-7075
            Attorneys for Defendant

FINDINGS AND RECOMMENDATION - 1

JELDERKS, Magistrate Judge:

Plaintiff Janet Shannon brings this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security (the Commissioner) terminating her receipt of disability payments.  Plaintiff's request for an order reversing the Commissioner's decision should be granted, and this action should be remanded for an award of benefits.


## PROCEDURAL BACKGROUND

Plaintiff applied for Disability Insurance Benefits on June 13, 1995.  After her application for benefits was denied initially and upon reconsideration, a hearing was held before ALJ John Madden on March 13, 1997.  In a decision dated April 15, 1997, ALJ Madden concluded that plaintiff had been disabled since June 1, 1995, due to a cervical fusion and bilateral carpal tunnel syndrome.  In his decision, ALJ Madden noted that, one month earlier,  plaintiff had undergone an anterior cervical diskectomy at C5-6, with removal of a protruding disc, and that a foraminotomy and fusion had been performed.  ALJ Madden concluded that, though plaintiff had been "generally credible," she "obviously exaggerated her testimony in regards to the limitations caused by hepatitis." He noted that plaintiff had recently had surgery that was

expected to improve her spinal problems, and recommended that a "review for medical improvement" be conducted in 12 to 18 months.

Plaintiff received Supplemental Security Income (SSI) payments for several years based upon the initial determination that she was disabled within the meaning of the Act. However, on December 2, 2002, plaintiff was notified that her benefits would be discontinued after February, 2003, because the Social Security Administration had concluded that her health had improved enough that she could work.

Plaintiff challenged the termination of benefits, asserting that she continued to be disabled by a spinal impairment, bilateral carpal tunnel syndrome, and hepatitis C. Her request for reconsideration of that decision was denied on July 25, 2003, and, pursuant to her timely request, a hearing was held before ALJ Madden on March 3, 2005. Plaintiff, who was represented by counsel, and Patricia Lesh, a Vocational Expert (VE), testified at the hearing.

In a decision dated May 26, 2005, ALJ Madden concluded that plaintiff's medical condition had improved enough that she was no longer disabled within the meaning of the Act. That decision became the Commissioner's final decision on July 14, 2005, when the Appeals Council denied plaintiff's request for review. In the present action, plaintiff challenges that decision.

## FACTUAL BACKGROUND

Plaintiff was 54 years old at the time of the May 2005 hearing held before the ALJ.  She graduated from high school, and has past work experience as a waitress, bookkeeper, office worker, and motel clerk.

## MEDICAL RECORD

As noted above, plaintiff was awarded disability benefits based on a finding that she had been disabled as of June 1, 1995, by a spinal impairment and bilateral carpal tunnel syndrome.  Since being awarded disability benefits in 1997, plaintiff has undergone aggressive treatment for her spinal condition, carpal tunnel condition, and hepatic condition. She underwent bilateral carpal tunnel releases in 1998, completed six months of interferon treatment for hepatitis in March 2001, and underwent a second spinal surgery in January 2002.

On October 11, 2001, Dr. Jerry Boggs, plaintiff's treating neurologist, diagnosed plaintiff with refractory migraine-type headaches.  On September 26, 2005, Dr. Lawrence Maccree diagnosed plaintiff with migraines, peripheral neuropathy, and possible vertebroasilar insufficiency.

In a surgery performed on January 4, 2002, Dr. Rees Freeman cleaned up a fusion at C6-7 that he had performed in 1995 and performed a new fusion from C5 to C6 to C7 with

instrumentation.  An x-ray taken on May 27, 2002 showed no

significant subluxation, and a cervical x-ray taken the next

day showed stable postoperative changes of the anterior

cervical fusion.  A CT of the cervical spine taken on July 19,

2002, showed a completed spinal fusion, with vertebral bodies

well aligned, and no definite foraminal encroachment.

Plaintiff was evaluated by Anthony Glassman, M.D., on

September 25, 2002.  During that evaluation, plaintiff

reported that, though her pain had improved since the last

fusion, she continued to experience chronic pain and fatigue.

Plaintiff stated that she had experienced chronic fatigue

since her liver was lacerated in a motor vehicle accident in

1975, and that she could walk only 2 to 3 blocks.  She added

that she had experienced esophageal discomfort since the

fusion surgery performed in January 2002.  Plaintiff stated

that she smoked one half pack of cigarettes per day, which was

reduced from the two packs per day she was smoking earlier

that year.

Dr. Glassman diagnosed plaintiff with chronic

Hepatitis C, chronic neck pain, and a swallowing disorder.

Based upon his assessment, Dr. Glassman concluded that

plaintiff could perform sedentary activity, was limited to

that activity by fatigue, probably secondary to liver disease,

and had limited cervical range of motion.  Dr. Glassman stated

that he did not have any laboratory results to objectively

support plaintiff's report of fatigue and liver damage. He
indicated that plaintiff could lift 15 lbs. occasionally and 4
lbs. frequently, could walk and stand two hours during an
eight-hour day, and could sit for six hours during an eight-
hour day. Dr. Glassman indicated that plaintiff could walk
one or two blocks, and that she required frequent naps.

In September, 2002, plaintiff reported that her liver
function had been reduced to about 25% of normal function the
previous year before she had received interferon treatment.
In an evaluation dated November 26, 2002, Edward Yurchak,
M.D., noted that plaintiff's blood tests and liver ultrasounds
were within normal levels. Dr. Yurchak found no evidence that
plaintiff's hepatic condition limited her residual functional
capacity. In addition, a complete abdominal ultrasound
performed on December 20, 2002, which examined the
gallbladder, pancreas, kidneys, and liver, showed normal
results.

On August 25, 2002, plaintiff told Shioban O'Reilly, her
treating D.O., that she was experiencing muscle spasms in her
neck, left arm numbness, and headaches. She said that she
felt worse as the day progressed, and could not put her head
back without experiencing dizziness and "floaters." In a
visit to Dr. O'Reilly on September 9, 2002, she reported
continued neck pain and fatigue.

Plaintiff was examined by Dr. Stewart Wilson, an opthalmologist, on September 20, 2002.  Dr. Wilson found no problem with plaintiff's eyes that would cause or contribute to headaches, and found no evidence of a neurological disturbance.  Dr. Wilson opined that plaintiff's headaches were related to her cervical problems.

On September 30, 2002, plaintiff complained to Dr. O'Reilly about neck pain and headaches.  She reported headaches and neck spasms in a visit to Dr. O'Reilly on October 11, 2002.

In a report dated November 26, 2002, William Backlund, M.D., a reviewing physician, noted that, while plaintiff's fusion at C5-6 had not been solid when she was evaluated as disabled in 1997, plaintiff now had a "solid two-level fusion" with no evidence of disc herniations.  Dr. Backlund added that an examination conducted in September 2002 "was essentially normal except for some decreased ROM which is not totally objective."

On December 23, 2002, Dr. Boggs diagnosed plaintiff with a myofascial pain syndrome.

On January 3, 2003, plaintiff told Dr. O'Reilly that she continued to experience severe neck pain and headaches, but that trigger point injections had given her some benefit, and that her back was improving.  On January 20, 2003, she told Dr. O'Reilly that she could not do vacuuming, and Dr. O'Reilly

recommended that she avoid activities that increased her
muscle tension.

Plaintiff received trigger point injections on
February 6, 2003.  On February 24, 2003, she told Dr. O'Reilly
that she continued to experience daily headaches and numbness
in her left arm.  She again reported headaches and numbness in
her left arm, as well as spasms, in a visit to Dr. O'Reilly on
March 3, 2003.  She reported that the most recent trigger
point injections had not given her relief.

In a report dated April 3, 2003, Dr. Freeman, plaintiff's
treating surgeon, noted that conduction studies performed on
December 23, 2002, demonstrated "no neural element pathology"
of plaintiff's carpal tunnel and ulnar nerves.  This indicated
that plaintiff's carpal tunnel releases apparently had been
successful with no remaining nerve compressions.  Additional
nerve conduction studies conducted on plaintiff's left upper
extremity on May 7, 2003, were likewise normal.  Jerry Boggs,
M.D., plaintiff's treating neurologist, reported that there
were no findings from nerve conduction studies or
electromyography suggesting distal entrapment neuropathy,
brachial plexopathy of the left upper extremity, or
radiculopathy from the C5 through T1 myotomes.

In his report of April 3, 2003, Dr. Freeman noted that
plaintiff had been noncompliant with his instructions by
continuing to smoke fairly heavily.  Dr. Freeman noted that he

had explicitly instructed plaintiff that smoking would impede her fusion and/or slow regrowth of her liver, but that plaintiff had continued to smoke.  Dr. Freeman noted that radiodiagnostic films appeared to demonstrate good incorporation of the bone graft and end plates, but that incorporation remained in question, given plaintiff's reports of tobacco use.  Dr. Freeman stated that tobacco use increased plaintiff's risk for a failed fusion.

Plaintiff continued to report headaches in a visit to Dr. O'Reilly on April 21, 2003.  Dr. O'Reilly diagnosed anxiety and suggested that plaintiff take Welbutrin, which she thought might help plaintiff stop smoking.

In a visit to Dr. O'Reilly on May 28, 2003, plaintiff reported dizziness and lightheadedness.

In a visit to Dr. Boggs on July 2, 2003, plaintiff reported neck pain and muscle spasms, as well as numbness and aching in her left arm.  Dr. Boggs noted that "extensive electrodiagnostic and imaging studies" he had conducted were "completely unremarkable in regard to both nerve conduction studies and electromyography."  Dr. Boggs noted that motor and sensory exams were unremarkable, and opined that plaintiff's neck and limb pain syndrome was "most likely musculoskeletal or myofacial in nature."  He added that he could not "substantiate a pathologic abnormality" on plaintiff's vestibular or cerebellar examination.

During visits to Dr. O'Reilly in July and August of 2003, plaintiff continued to report dizziness, headaches, and numbness.  In October, 2003, she told Dr. O'Reilly that her arms, shoulders, and legs ached, and that she continued to experience headaches and neck spasms.  Dr. O'Reilly noted that plaintiff exhibited some unsteadiness in her gait during a visit on October 31, 2003.

On October 26, 2003, Gerald Engstrom, M.D., diagnosed plaintiff with a sinus infection.  Dr. Engstrom stated that plaintiff appeared to have "acute exacerbation and COPD," and opined that, given plaintiff's long history of smoking, this could be causing the intermittent episodes of lightheadedness, dizziness, and difficulty breathing which plaintiff reported. Dr. Engstrom advised plaintiff to stop smoking.

Following an office visit on November 12, 2003, Carl Schreiner, M.D., diagnosed plaintiff with benign positional vertigo.  Dr. Schreiner noted that plaintiff was a heavy smoker.

In a letter dated February 21, 2005, Dr. O'Reilly, plaintiff's treating physician, reported that plaintiff "has chronic neck pain and numbness and weakness in the arms." Dr. O'Reilly opined that plaintiff was "disabled as she is unable to sit for prolonged periods," and added that plaintiff was "unable to do any manual labor."  Dr. O'Reilly added that

plaintiff "would be unable to attend work for an 8 hour day, even with normal break periods."

## HEARING TESTIMONY

### A. Plaintiff

Plaintiff testified as follows at the hearing before the ALJ:

> -The surgery performed in 2002 helped, but plaintiff has continued to experience pain and numbness in her left arm. She experiences constant numbness, and has frequent migraines. Plaintiff now has numbness in her right arm as well, and feels numbness down both arms into her hands. She also has numbness into her back and hips. The numbness in the right arm started after the last surgery, and has worsened with time. The numbness in her left arm is more severe.

> -When plaintiff's hands become numb, she loses the grip in her hands. Though she can hold a cup of coffee, she cannot pick up anything heavy because it causes her too much pain. Plaintiff can write, but holding her head down for any length of time causes spasms in her neck and causes migraines. Turning her neck to the left or right causes spasms. If

plaintiff needs to turn, she turns her whole body.
Though she is able to drive, she tries to avoid it
because of the need to look around, and looking up
is "almost impossible."  Sitting for 30 minutes
causes significant pain.

-Plaintiff experiences "pressure" type headaches,
which cause her to feel as if "somebody's taken a
board and just whacked you on the back of your
head."  Plaintiff feels lightheaded and dizzy when
she has a headache.  Headaches prevent her from
focusing, and cause her to stagger.  Headaches may
be triggered by looking down, changing positions, or
might occur when plaintiff is simply sitting or
lying in bed.  Plaintiff experiences headaches every
day, and experiences "really bad ones" at least
twice a week.  Sometimes taking Imitrex immediately
helps relieve bad headaches, but sometimes it does
not.  If the drug does not help, plaintiff sees
"white floaters" and cannot focus.  Plaintiff uses
Hydrocodone/Icondone, Mobic, and Flexeril every day.
Plaintiff has vertigo and gets dizzy frequently.

-Plaintiff's boyfriend helps her with her laundry,
and a friend cleans for her.  Sometimes her

boyfriend does the vacuuming because it causes her too much pain.  She sometimes prepares "small meals" for herself, and sometime does her shopping if no one is available to help her.

-Plaintiff does not read because holding her head down causes pain.

-Plaintiff's condition has worsened since she was found to be disabled in 1997.  She cannot do her past work as a bookkeeper because she cannot sit comfortably or hold her head down, or bring her arms up.

B. Vocational Expert

In response to questioning by plaintiff's counsel, the VE testified that a bookkeeping position requires the ability to at least occasionally move the head down, and that an individual who had incapacitating headaches twice a week cannot perform any competitive employment.

## BURDEN OF PROOF AND PROCESS
## FOR EVALUATING CONTINUING DISABILITY

A claimant bears the burden of establishing that she is disabled within the meaning of the Act.  E.g., Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  Disability is

FINDINGS AND RECOMMENDATION - 13

defined, under the Act, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 1382c(a)(3)(B).  A claimant is disabled if her impairments preclude performance of both her previous work and performance of other jobs that exist in substantial numbers in the national economy.  See 42 U.S.C. § 1382c(a)(3)(B); Tackett, 180 F.3d at 1098.

    If disability is established, a claimant's continued entitlement to disability benefits must be periodically reviewed.  20 C.F.R. § 416.994(a).  No inference as to whether the disability continues is to be drawn from a previous determination that the claimant was disabled.  42 U.S.C. § 423(f)(1).  Instead, an ALJ is to view the evidence from a neutral perspective.  See id.

    In determining whether a claimant continues to be disabled, the first issue is whether the claimant has an impairment or combination of impairments that meets or equals the severity of an impairment listed in appendix 1 of subpart P of part 404 of Chapter 416.  20 C.F.R. § 416.994(b)(5)(I).  A claimant who has such an impairment or impairments continues to be disabled within the meaning of the Act.  Id.

If the claimant does not have an impairment that meets or equals a listed impairment, at the second step, a determination is made as to whether a medical improvement in the claimant's condition has occurred.  20 C.F.R. § 416.994(b)(5)(ii).

If there has been medical improvement in the claimant's condition, at step three, a determination is made as to whether the improvement has increased the claimant's residual functional capacity.  20 C.F.R. § 416.994(b)(5)(iii).

If the claimant's medical condition has not improved and no relevant exceptions listed in the fourth step of the analysis applies, the claimant's disability is found to continue.  20 C.F.R. § 416.994(b)(5)(iv).  If the medical condition has not improved and an exception applies, the claimant's disability is found to have ended.  Id.

If the claimant's medical condition has improved and the improvement is related to the claimant's ability to work, at step five, a determination is made as to whether the claimant's current impairments, in combination, are severe. 20 C.F.R. § 416.994(b)(5)(v).  If the claimant's current impairments, in combination, do not significantly limit the claimant's physical or mental abilities to do basic work activities, the claimant is no longer considered to be disabled.  Id.

If the claimant's impairments are severe, at step six,
the claimant's current ability to perform substantial gainful
activity is assessed.  20 C.F.R.§ 416.994(b)(5)(vi).  At this
step, the claimant's residual functional capacity is assessed
based upon the claimant's current impairments, and the
claimant's ability to perform past relevant work is evaluated.
Id.  If the claimant can perform her past relevant work,
disability is found to have ended.  Id.

If the claimant is not able to perform her past work, at
step seven, her ability to perform other work is determined.
20 C.F.R. § 416.994(b)(5)(vii).  If the claimant can perform
such work, her disability is found to have ended.  Id.

## ALJ'S DECISION

At the outset, the ALJ limited the time relevant to the
determination of disability to December 2002, when the
administration determined that plaintiff was no longer
disabled, through December 2003.  He defined this period as
the time that was relevant for comparison to the earlier time
when plaintiff was initially found to be disabled.  The ALJ
added that he did not analyze whether plaintiff "was disabled
in 2004, or later," noting that the question whether plaintiff
was disabled at that time "has not been evaluated at earlier
levels of review" and declining to "address such issues of
first impression."  The ALJ further stated that, to the extent

FINDINGS AND RECOMMENDATION - 16

that "claimant reports and/or the medical record indicates
that the claimant has new and/or exacerbated conditions
currently, the claimant may seek review of such issues through
a new application for benefits, which should also provide a
detailed assessment regarding the claimant's noncompliance
with medical direction as part of that review."

The ALJ found that plaintiff had not engaged in
substantial gainful activity since 1995.

At the first step of the disability review process, the
ALJ found that, since at least December 2002, plaintiff's
severe and non-severe impairments, considered singly and in
combination, did not meet or equal any impairment set out in
Appendix 1, Subpart P, Regulations No. 4 (the "listings").

The ALJ next found that there was "new and substantial
evidence in the record" that improvement in plaintiff's
medical condition had decreased the medical severity of
plaintiff's impairments.

At the next step of the analysis, the ALJ found that
plaintiff's medical improvement was directly related to her
ability to work.

The ALJ next found that plaintiff had one or more
medically determinable impairment that was "severe" within the
meaning of the Act.  "Giving plaintiff the benefit of the
doubt," the ALJ concluded that her degenerative disc disease
"post fusions" was a severe impairment.  The ALJ noted that

Dr. Freeman, plaintiff's surgeon, noted "as recently as September 9, 2004, that myleogram's [sic] and CT scans do not demonstrate any cause for her ongoing symptoms." He added that plaintiff's hepatitis C liver condition was "nonsevere in 2002 and 2003" following treatment in 2001, and that plaintiff's "[r]esiduals of bilateral carpal tunnel syndrome status post surgical release in 1998 were nonsevere in 2002 and 2003."

At the next step of his analysis, the ALJ found that "[s]ince at least December of 2002, through at least December of 2003, the claimant retained the residual functional capacity to perform a reduced range of light and sedentary exertional level work." The ALJ found that plaintiff could lift/carry up to 15 lbs. occasionally, and could lift/carry 10 lbs. frequently. He further found that plaintiff could stand/walk at least two hours in an 8-hour workday, and could sit for about six hours in an 8-hour workday. The ALJ found that plaintiff could only occasionally balance, stoop, kneel, crouch, crawl, and climb ladders, ropes, and scaffolds, and that she could only occasionally reach overhead.

The ALJ next found that plaintiff retained the residual functional capacity required to perform her past relevant work as a bookkeeper. He found that, "from at least December of 2002 through December of 2003," plaintiff had not been disabled within the meaning of the Act.

In finding that plaintiff was not disabled, at least during that period, the ALJ found that plaintiff's "allegations regarding her limitations" were not wholly credible.  In support of this conclusion, the ALJ stated that plaintiff's allegations were "extremely disproportionate to the minimal objective findings in the medical record," and opined that plaintiff's reported activities were "more consistent with those of an individual able to sustain work than they are of an incapacitated person's activities."

**STANDARDS**

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); see also, Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The ALJ is responsible for making credibility determination, resolving any conflicts in the medical testimony, and for resolving any ambiguities.

Andrews, 53 F.3d at 1039.  If "the evidence is susceptible to more than one rational interpretation," the ALJ's decision must be upheld.  Id. at 1039-40.

## DISCUSSION

Where, as here, a claimant has received medical benefits based upon a finding of disability, those benefits may be terminated if there is substantial evidence that there has been medical improvement in the claimant's impairment or impairments, and the claimant can engage in substantial gainful activity.  See 42 U.S.C. § 423(f)(1); 1382c(a)(4). Medical improvement is a decrease in the medical severity of an impairment or impairments that existed when the claimant was most recently found to have disabled.  20 C.F.R. § 416.994(b)(1)(I).  A decrease in the medical severity of an impairment is shown when, compared with earlier medical evidence, the current medical evidence shows improvement in the symptoms, signs, or laboratory findings that are associated with the impairment.  20 C.F.R. § 416.994(b)(2)(I).

The agency bears the burden of establishing that the claimant is able to engage in substantial gainful activity before benefits are terminated.  20 C.F.R. § 404.1594(b)(5). The agency must consider all of the claimant's impairments at the time of the review, not just those that were present when the most recent finding of disability was made.  Id.

Plaintiff contends that, in determining that she was no longer disabled as of December 2002, the Commissioner erred in: 1) failing to meet the burden of producing evidence to rebut a presumption of continuing disability; 2) failing to provide clear and convincing reasons for rejecting plaintiff's allegations concerning her symptoms; 3) failing to provide clear and convincing reasons for rejecting the opinion of Dr. O'Reilly, her treating physician, that she was disabled; and 4) finding that plaintiff retained the residual functional capacity required to perform her past work as a bookkeeper.

## I.    Establishing continuing disability

### A. Burden of Proof

Plaintiff asserts that the Commissioner failed to meet the burden of overcoming a presumption of continuing disability that arises from the earlier favorable decision finding that plaintiff was disabled.    This assertion misstates the Commissioner's burden: The determination of disability is to be made "on the basis of the weight of the evidence . . . without any initial inference as to the presence or absence of disability being drawn from the fact that the [claimant] has previously been determined to be disabled."    42 U.S.C. §§ 423(f)(1); 1382c(a)(4).

This is not, however, a critical issue here.    Even though a prior finding of disability does not give rise to a

presumption of continued disability, payments based upon a
disability may not be discontinued unless the agency finds
that the claimant's medical condition has improved, based upon
substantial evidence in the record.   42 U.S.C. § 423(f)(1).
In order to discontinue benefits, the agency must show that
the claimant is able to engage in substantial gainful
activity.   20 C.F.R. § 404.1594(b)(5).  As noted above, in
doing so, the agency must consider all of the claimant's
current impairments, not only those that were present when the
claimant was initially found to be disabled.   Id.

## B.   Evidence ALJ Considered in Finding Plaintiff is Not Disabled

As noted above, in determining whether plaintiff's
disability continued, the ALJ considered the period of
December 2002, when the agency found that plaintiff was no
longer disabled, through December 2003.

Plaintiff does not dispute the appropriateness of this
time frame, but contends that the ALJ erred in failing to
consider all of her impairments present during that period.
Plaintiff contends that the ALJ failed to consider new
conditions that developed following her surgery in 1997.
Plaintiff asserts that she developed severe headaches, which
were accompanied by nausea, vomiting, and photophobia, after
she underwent interferon therapy in 2001.   She notes that Dr.

Boggs diagnosed refractory migraine-type headaches in October, 2001, which he treated with Neurontin, and diagnosed a myofascial pain syndrome in December 2002.  She adds that Dr. Maccree also diagnosed her with migraines in September 2005.

Plaintiff contends that the ALJ erred in failing to address her migraines and myofascial syndrome, and in failing to include these as "severe" impairments in evaluating her residual functional capacity.  I agree.  As plaintiff correctly notes, if a treating physician's medical opinion is supported by medically acceptable diagnostic techniques, and is not inconsistent with other substantial evidence in the medical record, it is given controlling weight.  See Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001); 20 C.F.R. § 404.1527(d)(2).  The uncontradicted medical opinion of a treating physician may be rejected only by clear and convincing reasons that are supported by substantial evidence in the record.  Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Here, Dr. Boggs' diagnoses of migraines and myofascial pain were uncontradicted, and these conditions were present during the time relevant to the ALJ's decision.  The ALJ erred in failing to address these conditions, and to either include them in assessing plaintiff's residual functional capacity, or provide reasons, supported by the medical evidence, for failing to do so.

As noted above, in determining whether a claimant continues to be disabled, the agency must consider not only the impairments upon which the finding of disability was initially made, but all impairments present at the time of the review.  The ALJ's conclusion that plaintiff's spinal condition and carpal tunnel syndrome had improved since she was initially found to be disabled was supported by substantial evidence in the record.  The ALJ erred, however, in failing to fully consider the severity of plaintiff's other impairments in the face of medical evidence that these had developed or worsened since the earlier finding of disability was made.  Though the Commissioner now contends that plaintiff's migraines and arm numbness need not be considered because they do not meet the requirement that an impairment last for at least 12 months, the record shows that plaintiff reported severe headaches and arm numbness for more than a 12-month period during the time relevant to the disability determination at issue here.

Plaintiff also contends that the ALJ erred in failing to address Dr. Schreiner's diagnosis of benign positional vertigo.  I disagree.  In the report of plaintiff's visit resulting in that diagnosis, Dr. Schreiner noted that plaintiff had reported a "2 to 3 week history of severe vertigo," and had stated that she had experienced "intermittent episodes of vertigo in the past."  There is not

substantial evidence in the record that plaintiff's vertigo was a condition that lasted or was expected to last for 12 months or more.  In order to qualify as a disabling condition, an impairment must last or "be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 1382c(a)(3)(B).

II. ALJ's Credibility Determination

As noted above, in finding that plaintiff was no longer disabled within the meaning of the Act, the ALJ found that plaintiff's "allegations regarding her limitations" were not wholly credible.  Plaintiff contends that the ALJ failed to sufficiently support this conclusion.

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities.  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  If a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony concerning the severity of symptoms merely because they are unsupported by objective medical evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) citing Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1990)(en banc).  Unless there is affirmative evidence that the claimant is malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony.

Id., quoting Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).

An ALJ rejecting a claimant's testimony may not simply provide "general findings," but instead must identify the testimony that is not credible and the evidence that undermines the claimant's complaints. Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). In addition, SSR 96-7 requires an ALJ to consider the entire record and to consider several factors, including the claimant's daily activities, medications taken and their effectiveness, treatment other than medication, measures other than treatment used to relieve pain or other symptoms, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms."

Here, plaintiff produced objective medical evidence of several underlying impairments that could reasonably be expected to produce the pain and other symptoms that plaintiff alleged, and there was no affirmative evidence of malingering. These impairments included a multilevel fusion, myofascial pain syndrome, migraines, and peripheral neuropathy. Accordingly, the ALJ was required to provide clear and convincing reasons for concluding that plaintiff's allegations were not wholly credible.

The ALJ cited four factors in support of his conclusion that plaintiff's testimony concerning the severity of her

symptoms was not wholly credible.  First, the ALJ found that plaintiff's allegations were "extremely disproportionate to the minimal objective findings in the medical record." Second, the ALJ found that plaintiff's reported activities were "more consistent with those of an individual able to sustain work than they are of an incapacitated person's activities."  Third, the ALJ cited plaintiff's continued cigarette smoking, in the face of her doctor's warning that smoking would impede her fusion and/or delay liver regrowth, as evidence that "claimant was not so limited as to see the need to aggressively pursue remedies."  Fourth, the ALJ found that Dr. Glassman's assessment suggested that plaintiff was able to sustain an 8-hour work day, which she could not do when plaintiff was previously found to be disabled.

These are not clear and convincing reasons for rejecting plaintiff's allegations concerning her symptoms.  The ALJ's assertion that plaintiff's allegations are "extremely disproportionate" to objective findings in the medical record is not persuasive, and is only accurate if plaintiff's migraines and myofascial pain syndrome are not considered. However, these impairments cannot be ignored, because these are conditions that have been diagnosed by treating or examining physicians, have lasted more than 12 months, and can reasonably be expected to cause symptoms.

The ALJ's characterization of plaintiff's description of her activities of daily living is not accurate.  Plaintiff did testify that she could drive, perform light household chores, shop for groceries, and prepare simple meals.  However, the activities that plaintiff described were very limited, and plaintiff testified that her ability to carry out the most simple of tasks was substantially limited by her symptoms. Plaintiff testified that, though she could drive, she generally tried to avoid doing so because it was difficult for her to turn to see traffic.  She also testified that the several medications that she takes for pain management make her drowsy.  She testified that she could not read because she could not hold her head in a position that allowed her to do so comfortably, and that she could not sustain most basic activities because of pain and fatigue.  Plaintiff's description of her activities of daily living was not, as the ALJ found, consistent with the activities of an individual who was able to sustain work.

There is no question that plaintiff was advised many times to stop smoking cigarettes, and that she failed to do so though she was told that smoking would impede her fusion and/or slow regrowth of her liver.  In addition, "unexplained or inadequately explained failure to seek treatment or follow a prescribed course of treatment" may constitute evidence that a claimant is not disabled.  Fair v. Bowen, 885 F.2d 597, 603

(9th Cir. 1989). Here, however, it appears that plaintiff's
failure to stop smoking cigarettes more likely demonstrates
the severity of plaintiff's addiction to tobacco than supports
an inference that her condition was not so severe that pursuit
of a remedy was important. The medical record as a whole
shows a claimant who aggressively sought medical care and
treatment, and, with the exception of her failure to stop
smoking, appeared to follow her doctor's instructions.

Finally, though Dr. Glassman did opine that plaintiff
could perform sedentary work, his assessment was not
inconsistent with the limitations that plaintiff herself
described, and did not support the conclusion that plaintiff
was not credible. Though Dr. Glassman indicated that
plaintiff could walk and stand for two hours and sit for six
hours during an 8-hour day, he also opined that she required
frequent naps. Nothing in Dr. Glassman's report suggested
that this need for naps would occur only outside the hours of
a regular work day.

## III.   Rejecting Opinion of Dr. O'Reilly

As noted above, Dr. O'Reilly, plaintiff's treating
physician, opined that plaintiff experiences chronic neck pain
with numbness and weakness in the arms, is "disabled as she is
unable to sit for prolonged periods," is "unable to do any

manual labor," and "would be unable to attend work for an 8 hour day, even with normal break periods."

Without referring to Dr. O'Reilly by name, the ALJ stated that "[m]edical conclusions regarding the claimant's functional abilities in 2005 (e.g., Exhibit B-23-F, page 1) are not found to be relevant to the claimant's functional abilities in 2002-2003, since they do not indicate they are retrospective, and since the medical record and the claimant's testimony suggests a possibility of new impairments and an alleged worsening of symptoms in recent years."  The referenced exhibit contains Dr. O'Reilly's opinion that plaintiff is disabled.

Because treating physicians have a greater opportunity to know and observe their patients, their opinions are given greater weight than the opinions of other physicians. Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989). Accordingly, an ALJ must support the rejection of a treating physician's opinion with "findings setting forth specific and legitimate reasons for doing so that are based on substantial evidence in the record."  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  Rejection of a treating physician's uncontroverted opinion must be supported by clear and convincing reasons.  Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).

In simply dismissing Dr. O'Reilly's opinion that plaintiff is disabled on the grounds that it refers to plaintiff's condition in 2005, and not during the relevant 2002-2003 period, the ALJ did not provide a sufficient basis for rejecting a treating physician's opinion.  Dr. O'Reilly's conclusions that plaintiff experienced chronic neck pain with numbness and weakness in the arms and was unable to perform manual labor were not controverted in the medical evidence, and her opinion that plaintiff could not complete a normal 8-hour work day with normal breaks is not inconsistent with Dr. Glassman's conclusion that plaintiff would require frequent naps. Though Dr. O'Reilly did not state that plaintiff became disabled as of a particular date, the conditions which she cites as disabling in her letter written in early 2005 are the same conditions for which she had treated plaintiff during the relevant 2002-2003 period.  These conditions are cited repeatedly in Dr. O'Reilly's chart notes of the earlier period, and these notes are consistent with Dr. O'Reilly's opinion as to the disabling effects of plaintiff's impairments.

IV.   <u>Remand for an Award of Benefits or for Further Proceedings</u>

The ALJ here erred in failing to consider all of plaintiff's impairments, in failing to adequately support his

determination that plaintiff was not fully credible, and in
failing to adequately support his rejection of the opinion of
plaintiff's treating physician.  These errors require that the
Commissioner's decision be reversed, and leaves only the
question whether the action should be remanded for an award of
benefits or for further proceedings.

When an ALJ improperly rejects a claimant's testimony
regarding her limitations and the claimant would be deemed
disabled if his testimony were credited, courts do not remand
solely to allow the ALJ to make further findings regarding the
testimony.  See Lester v. Chater, 81 F.3d 821, 834 (9th Cir.
1995) (citing Varney v. Secretary of Heath and Human Services,
859 F.2d 1396, 1401 (9th Cir. 1988)).  Instead, the testimony
is credited as a matter of law.  Id.  Likewise, when an ALJ
has provided inadequate reasons for rejecting the opinion of a
treating or examining physician, that opinion is credited as a
matter of law.  Lester, 81 F.3d at 834.  A reviewing court
then has the discretion to remand for further administrative
proceedings, or for a finding of disability and an award of
benefits.  See, e.g., Stone v. Heckler, 761 F.2d 530, 533
(9th Cir. 1985).

Whether an action is remanded for an award of benefits or
for further proceedings depends on the likely utility of
additional proceedings.  Harman v. Apfel, 211 F.3d 1172, 1179
(9th Cir. 2000).  A reviewing court should credit evidence and

remand for a finding of disability and an award of benefits
if: 1) the ALJ failed to provide legally sufficient reasons
for rejecting the evidence; 2) there are no outstanding issues
to be resolved before a determination of disability can be
made; and 3) it is clear from the record that the ALJ would be
required to find the claimant disabled if the evidence in
question were credited.  Smolen v. Chater, 80 F.3d 1273, 1292
(9th Cir. 1996).

Under the guidance of these decisions, I recommend
remanding this action for a finding of disability and an award
of benefits.  The record before the court is complete, and it
is clear from that record that, if the evidence that was
improperly rejected were properly credited, a finding of
disability would be required.  Further proceedings would
likely add nothing but needless delay.

**CONCLUSION**

A judgment should be entered remanding this action to the
agency for an award of benefits.

**SCHEDULING ORDER**

The above Findings and Recommendation are referred to a
United States District Judge for review.  Objections, if any,
are due August 2, 2007.  If no objections are filed, review of

the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections within 10 days after service of a copy of the objection. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or the latest date for filing a response.

DATED this 17th day of July, 2007.

_____
John Jelderks
U.S. Magistrate Judge